IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| ABIEL OSORIO COTTO, BENJAMIN OSORIO, LUIS ENRIQUE CAMACHO MATTOS, DAVID PAUL GATREAUX, JEREMY SANTOS RAMIREZ, NORBERTO RIVERA FRESE, RAFAEL ERNESTO PASTRANA LUGO and DAVID LAMBERT, <br><br> Plaintiffs, <br><br> vs. <br><br> TJ SUTTON ENTERPRISES, LLC d/b/a TJ SUTTON, LLC; AECOM, INC.; AECOM CARIBE, LLP; CITADEL RECOVERY SERVICES, LLC; BLUEWATER CONSTRUCTION, INC. d/b/a BLUEWATER STAFFING COMPANY; THOMAS J. SUTTON; CELESTINO A. WHITE, SR. d/b/a CELESTINO WHITE CONSULTING & MANAGEMENT FIRM; JOHN DOE and JANE DOE (landlords), <br><br> Defendants. | Civil No. 2021-16 |

**MEMORANDUM OPINION and ORDER**

Before the Court are "Defendant Citadel Recovery Services, LLC's [("Citadel")] Motion to Compel Arbitration and Stay Proceedings" [ECF 46] and "Defendants AECOM and AECOM Caribe, LLP's [("AECOM")] Motion to Compel Arbitration in Lieu of Answer and to Stay Litigation" [ECF 47]. Plaintiffs filed a consolidated opposition to the motions [ECF 50] and defendants Citadel and AECOM replied [ECFs 58, 59]. For the reasons that follow, the Court will grant the motion.

I.   BACKGROUND

On September 6 and September 20, 2017, Hurricanes Irma and Maria caused massive damage in the U.S. Virgin Islands. Compl. [ECF 1-2] ¶ 19. Following the storms, the Federal Emergency Management Agency implemented the "Sheltering and Temporary Essential Power

*Cotto, et al. v.TJ Sutton Enters., LLC, et al.*
Civil No. 2021-16
Page 2

Program" (the "STEP Program") to assist in the recovery of Virgin Islanders. *Id*. ¶ 20. On February 5, 2018, the Virgin Islands Housing Finance Authority entered a prime contract with AECOM to carry out activities under the STEP Program. *Id*.[1] AECOM subcontracted a portion of the work in the Master Subcontract (the "MSA") [ECFs 46-1, 46-2] to Citadel, which in turn subcontracted work to TJ Sutton Enterprises, LLC ("TJS")[2] [ECF 47-2]. TJS then contracted with Blue Water Staffing Company ("Blue Water")[3] to, among other things, recruit, supervise, and pay "Assigned Employees"—a group that included most of the plaintiffs by name. [ECF 46-3] at 1, 3; *see* Compl. [ECF 1-2] ¶¶ 22-24, 31.

Plaintiffs allege they were hired on January 14, 2019 and subsequently provided services for the STEP Program. Compl. [ECF 1-2] ¶¶ 31, 36. Plaintiffs claim that although Blue Water promised to pay them, the "defendants" failed to pay. *Id*. ¶¶ 29, 37. Plaintiffs further aver that TJS wrongfully terminated them on March 2, 2019. *Id.* ¶ 40. Plaintiffs also contend that Citadel obtained performance and payment bonds to cover the costs of all of the subcontractors and employees, including plaintiffs. *Id.* ¶ 41. Finally, plaintiffs allege they were subject to discrimination and mistreatment; they bring 22 claims under federal and local law. [ECF 1-3] at 4-5 (Table of Counts).

Plaintiffs filed suit in the Superior Court of the Virgin Islands on November 22, 2020, and on February 11, 2021, TJS removed the case to this Court. [ECF 1]. On May 11, 2021, AECOM and Citadel initiated arbitration by filing a demand for arbitration with the American Arbitration

---

[1] *See* [ECF 46-1] at 1-2 (referring to the prime contract dated 2/5/2108).

[2] Plaintiffs also named Thomas J. Sutton, TJS' principal, as a defendant. [ECF 1-2] ¶ 17.

[3] Plaintiffs named as a defendant "Bluewater Construction, Inc. d/b/a Bluewater Staffing Company." [ECF 1-2] ¶ 15. Bluewater Construction, Inc. contends it has been incorrectly named as a defendant and has filed a motion for summary judgment. [ECF 35]. It avers that it and Blue Water are distinct entities with no relation to one another. *Id*. at 3.

*Cotto, et al. v.TJ Sutton Enters., LLC, et al.*
Civil No. 2021-16
Page 3

Association. [ECF 47-4]. Citadel and AECOM filed their motions to compel arbitration on May 13, 2021. [ECFs 46, 47].

Citadel and AECOM point to the MSA's section 6.6.2, which requires arbitration of "all such disputes and other matters in question, of any kind, related to or arising out of this Agreement," if AECOM, at its sole option, chooses to resolve the dispute by arbitration rather than by litigation. [ECF 46] at 6-75; [ECF 47] at 2-3. Further, Citadel and AECOM assert that the same section of the MSA provides that "any issues regarding the arbitrability of any dispute shall be determined by the arbitrator(s)." [ECF 46] at 11-13; [ECF 47] at 11. They argue that because each subsequent contract either incorporates the MSA and other documents by reference, or contains its own arbitration clause, the plaintiffs are bound to arbitrate. This is so, they contend, because plaintiffs are intended third-party beneficiaries of the contracts, or they are estopped to claim they are not bound thereby. [ECF 46] at 15-18; [ECF 47] at 12-13.[4] Finally, Citadel and AECOM argue that arbitration is required not only under the provisions of the various contracts, but also under the Federal Arbitration Act ("FAA") and relevant caselaw. [ECF 46] at 10-14; [ECF 47] at 6-9.

Plaintiffs oppose arbitration and counter with several arguments. First, they contend they are exempt from arbitration under the FAA's section 1, the "residual clause," as interpreted by the United States Supreme Court in *New Prime, Inc. v. Oliveira*, 139 S. Ct. 532 (2019), and the Third Circuit in *Singh v. Uber Technologies, Inc.*, 939 F.3d 210 (3d Cir. 2019). [ECF 50] at 2-3. Next, plaintiffs argue that they had no written contract with defendants, and that the contracts on which defendants rely lacked consideration because plaintiffs were not paid. *Id*. at 4-5. Plaintiffs also

---

[4] Citadel argues additionally that plaintiffs, as agents of parties bound by arbitration provisions, are themselves bound to arbitrate. [ECF 46] at 18-20.

*Cotto, et al. v.TJ Sutton Enters., LLC, et al.*
Civil No. 2021-16
Page 4

claim they had no knowledge of the contracts between the other parties, despite asking for them. *Id*. at 6-7. Finally, plaintiffs argue that as non-signatories, they were, at most, indirect beneficiaries of the contracts. *Id*. at 7.

Citadel and AECOM dispute that plaintiffs are exempt from the FAA. [ECF 58] at 2-9; [ECF 59] at 2-5. Further, they challenge the assertion that plaintiffs cannot be bound to arbitrate because they did not sign a contract with defendants. [ECF 58] at 10-15; [ECF 59] at 6-14.

## II.   LEGAL STANDARDS

A.   <u>The FAA</u>

Under the FAA, a district court has jurisdiction over a motion to compel arbitration only if the court would have jurisdiction over "a suit arising out of the controversy between the parties" without the arbitration agreement. 9 U.S.C. § 4; *accord Vaden v. Discover Bank*, 556 U.S. 49, 59 (2009) (observing that an independent basis for federal jurisdiction over a dispute is required and that the FAA is not itself a basis for federal jurisdiction). Here, federal question jurisdiction exists over the underlying substantive dispute under 28 U.S.C. §1331; supplemental jurisdiction exists over the local law claims under 28 U.S.C. §1337. Thus, this Court has jurisdiction to decide Citadel's and AECOM's motions to compel arbitration.

The FAA applies to a contract "evidencing a transaction involving commerce to settle by . . . or . . . submit to arbitration" any controversy arising out of that contract.[5]  9 U.S.C. § 2.

---

[5] The FAA defines "commerce" as "commerce among the several States . . . or in any Territory of the United States . . . ." 9 U.S.C. § 1; *see Sewer v. Paragon Homes, Inc.*, 351 F. Supp. 596, 598 (D.V.I. 1972) (holding that the FAA "applies to mandate stays of legal proceedings conducted in the District Court of the Virgin Islands"). The Supreme Court has "interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (citation omitted). The Supreme Court has further explained that the phrase "evidencing a transaction" means that the transaction turns out, in fact, to involve interstate commerce, "even if the parties did not contemplate an interstate commerce connection." *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 281 (1995).

*Cotto, et al. v.TJ Sutton Enters., LLC, et al.*
Civil No. 2021-16
Page 5

Further, the FAA establishes a "strong federal policy in favor of resolving disputes through arbitration." *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 219 (3d Cir. 2014) (quotation marks omitted). Thus, "the Act [*i.e.*, the FAA], both through its plain meaning and the strong federal policy it reflects, requires courts to enforce the bargain of the parties to arbitrate" whenever possible. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) (stating that courts are required to resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration"). In addition, the FAA requires that written arbitration agreements be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration.").

Accordingly, prior to compelling arbitration pursuant to the FAA, a court must first conclude that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement. *Flintkote Co.*, 769 F.3d at 220. A "party to a valid and enforceable arbitration agreement is entitled to a stay of federal court proceedings pending arbitration as well as an order compelling such arbitration." *In re Pharm. Benefit Managers Antitrust Litig.,* 700 F.3d 109, 116 (3d Cir. 2012) (quotation marks omitted); *see* 9 U.S.C. §§ 3-4.

A non-signatory may be bound to arbitrate a dispute when "traditional principles of state law allow a contract to be enforced . . . against nonparties to the contract through assumption,

---

"The bar to establish an interstate nexus is low." *Whyte v Bockino*, 69 V.I. 749, 762 n.10 (V.I. 2018). The FAA's broad interstate commerce requirement is satisfied in this case. The transaction was between individuals from Puerto Rico and Louisiana (plaintiffs) and a Delaware limited liability partnership, North Carolina and Louisiana limited liability companies and various Virgin Islands individuals (defendants). Further, the contract was to be performed in the U.S. Virgin Islands. Accordingly, the transaction involved interstate commerce.

*Cotto, et al. v.TJ Sutton Enters., LLC, et al.*
Civil No. 2021-16
Page 6

piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (quotation marks omitted). Under the "knowingly exploits" theory of estoppel, a "non-signatory may be bound by an arbitration clause if [he] embraces the agreement and directly benefits from it." *Griswold v. Coventry First LLC*, 762 F.3d 264, 272 (3d Cir. 2014) (quotation marks omitted).[6] That is, a non-signatory party may be estopped from avoiding arbitration where the party has reaped or seeks to reap direct benefits from the agreement containing the arbitration clause. "This prevents a non-signatory from 'cherry-picking' the provisions of a contract that it will benefit from and ignoring other provisions that don't benefit it or that it would prefer not to be governed by (such as an arbitration clause)." *Invista S.à.r.l. v. Rhodia, SA*, 625 F.3d 75, 85 (3d Cir. 2010).

Finally, "parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (citations omitted). "To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists. *See* 9 U.S.C. §2. But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, the court may not decide the arbitrability issue." *Id.* In sum, "arbitration is a matter of contract, and courts must enforce arbitrations contracts according to their terms." *Id.* at 529.

---

[6] A court "must expressly consider 'whether the relevant state contract law recognizes [the theory relied upon by the signatory] as a ground for enforcing [a] contract[] against" a non-signatory. *Flintkote Co.*, 769 F.3d at 220 (alterations added) (quoting *Arthur Andersen LLP*, 556 U.S. at 632). Here, the Court must determine which state law governs the motions to compel arbitration—an issue none of parties addressed, although they each rely on Virgin Islands law for their positions.

*Cotto, et al. v.TJ Sutton Enters., LLC, et al.*
Civil No. 2021-16
Page 7

B.  Standards for Deciding a Motion to Compel Arbitration

Where "it is apparent" based on the complaint and supporting documents "that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 776 (3d Cir. 2013) (quotation marks omitted). In other words, "[m]otions to compel arbitration are reviewed under Rule 12(b)(6) '[w]here the affirmative defense of arbitrability of claims is apparent on the face of a complaint (or . . . documents relied upon in the complaint).'" *Sanford v. Bracewell & Guiliani, LLP*, 618 F. App'x 114, 117 (3d Cir. 2015). Further, in determining whether to compel arbitration, courts rely on the principles of applicable state law. *See Golden Gate Nat'l Senior Care, LLC v. Addison*, 2014 WL 4792386, at *13 (M.D. Pa. Sept. 24, 2014) (citing *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 475 (1989)).

Here, section 15.2 of the MSA provides for the application of "the law of the Prime Contract" and the "laws of the jurisdiction in which the Project is located." [ECF 46-1] at 12. In addition, Modification Number 03 to the MSA provides that the Prime Contract "shall be governed by and construed in accordance with the laws of the United States Virgin Islands." [ECF 46-2] at 2. Moreover, as noted, the down-stream contracts generally incorporate these senior agreements by reference. Thus, the Court will apply Virgin Islands law to the instant contract dispute.

C.  Virgin Islands Law

"The Virgin Islands Supreme Court has not expressly adopted the common law rule for formation of a valid contract." *Valentin v. Grapetree Shores*, 2015 WL 13579631, at *3 (V.I. Super. Ct. June 30, 2015). "However, the basic elements for what constitutes a valid contract are

so widely accepted and fundamental to the practice of law in the Virgin Islands and every other United States jurisdiction that maintaining these elements is unquestionably the soundest rule for the Virgin Islands."[7] *Id.* (citing *Machado v. Yacht Haven U.S.V.I., LLC*, 61 V.I. 373, 380 (2014)). Thus, "[i]n the Virgin Islands, a valid contract requires a 'bargain in which there is a mutual assent to the exchange, and consideration.'" *Id.; accord Sunshine Shopping Ctr., Inc. v. LG Elecs. Panama, S.A.*, 2018 WL 4558982, at *7 (D.V.I. Sept. 21, 2018) (applying Virgin Islands law). "Assent is not measured by subjective intent, but by outward expression." *Valentin*, 2015 WL 13579631, at *3. Further, "[i]n an arbitration agreement, consideration exists where both parties agree to be bound by the arbitration." *Id.*

Lastly, with respect to contract interpretation, the Supreme Court of the Virgin Islands has observed that "[i]f a contract is unambiguous, 'the meaning of [its] terms [i]s a question of law.'" *Phillip v. Marsh-Monsanto*, 66 V.I. 612, 624 (V.I. 2017). The court explained:

> [t]o determine whether a contract is ambiguous, we resort to principles of contract interpretation, keeping in mind that our primary purpose is to ascertain and give effect to the parties' objective intent. *See United Corp.* [*v. Tutu Park, Ltd.*], 55 V.I. at 719 n.14 ("[W]hen a court interprets a contract, its task is not to reveal the subjective intentions of the parties, but what their words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used." . . .) . . . Where the language of a contract is clear and unambiguous, the parties' intent must be derived from the plain meaning of its terms.

*Id.* at 624-25.

---

[7] Where prior precedent does not provide "the appropriate common law rule," the court must first "ascertain[] whether any Virgin Islands courts have previously adopted a particular rule, then identify[] the position taken by a majority of courts from other jurisdictions, and finally determin[e] which approach represents the soundest rule for the Virgin Islands." *Gov't of Virgin Islands v. Connor*, 2014 WL 702639, at *4 (V.I. Feb. 24, 2014) (citing *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967 (V.I. 2011)). This process has come to be known as a "*Banks* analysis."

*Cotto, et al. v.TJ Sutton Enters., LLC, et al.*
Civil No. 2021-16
Page 9

## III. DISCUSSION

A. <u>The Validity of the Contracts</u>

The first issue the Court must address is whether there exists a valid and enforceable contract. Plaintiffs argue that *they* did not have a valid contract with any defendant because there was a failure of consideration and no manifestation of assent. [ECF 50] at 4-5.[8] Plaintiffs do not argue, however, that the MSA, the Citadel-TJS subcontract, and the Staffing Agreement are invalid and unenforceable. Instead, they rely on one or more of those contracts to buttress certain aspects of their claims. *See, e.g.*, Compl. [ECF 1-2] ¶ 41 (discussing Citadel's performance and payment bonds that existed to cover subcontractors and their workers, including plaintiffs). In the absence of any other argument, the Court finds that these contracts are valid and enforceable. Whether they apply to plaintiffs will be addressed *supra*.

Further, the MSA allows AECOM to mandate that disputes arising under the agreement be resolved in arbitration. Specifically, section 6.6.2 of the MSA provides for arbitration of "all such disputes and other matters in question, of any kind, related to or arising out of this Agreement," at AECOM's sole option. [ECF 46-1] §6.6.2. This language is very broad and, given the plain meaning of the clause, certainly encompasses the failure to pay claims that plaintiffs raise. As noted earlier, AECOM elected to take these matters to arbitration.

B. <u>The Arbitrability of Plaintiffs' Claims</u>

The second issue the Court must address is whether plaintiffs' specific claims are arbitrable. MSA section 6.6.2 provides that "any issues regarding the arbitrability of any dispute shall be determined by the arbitrator(s)." *Id*. This language constitutes precisely the "clear and

---

[8] This argument is misplaced. Plaintiffs appear to conflate breach of contract (they were not paid as agreed), with the failure to form a contract in the first instance (plaintiffs agreed to and did come to work on the Step Program in exchange for a promise to pay).

*Cotto, et al. v. TJ Sutton Enters., LLC, et al.*
Civil No. 2021-16
Page 10

unmistakable evidence" of delegation of authority that the *Schein* Court required. 139 S. Ct. at 530 (quotation marks omitted). As a result, this Court "may not decide the arbitrability issue." *Id*. The Court must, however, determine whether plaintiffs, as non-signatories to the various agreements, are nevertheless bound to arbitrate—an issue that is distinct from whether the claims themselves are subject to arbitration.

C.     Plaintiffs' Status as Non-Signatories

First, the Court considers plaintiffs' contention that they are exempt from arbitration by section 1 of the FAA. Section 1 provides in part that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Plaintiffs maintain that section 1 exempts them because their employment "was a part of interstate commerce." [ECF 50] at 3. Citadel and AECOM counter that this exemption applies only to employees "engaged in" foreign or interstate commerce such as transportation workers, and that plaintiffs were not engaged in foreign or interstate commerce while employed in the Step Program. [ECF 58] at 2-7; [ECF 59] at 2-5.

In support of their position, plaintiffs cite the Supreme Court's decision in *New Prime* for the proposition that "'contracts of employment' referred to agreements to perform work" when used in the FAA. [ECF 50] at 3 (quotations marks omitted). However, plaintiffs do not identify where in the opinion such an observation appears, or what significance it has to plaintiffs' position. The Court does not deem the case relevant to plaintiffs' argument. The language plaintiffs cite appears at the end of the decision, after the Court framed the questions presented as follows: (1) whether the court or the arbitrator determines if the exemption applies, and (2) whether "the term 'contracts of employment' refer[s] only to contracts between employers and employees, or does it also reach contracts with independent contractors?" *New Prime, Inc.*, 139 S. Ct. at 536. Neither

of those questions are issues in this case. In fact, the *New Prime* Court acknowledged that in an earlier opinion it found that section 1 of the FAA exempted the employment contracts of transportation workers, as opposed to all employment contracts. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001). In sum, *New Prime* does not support plaintiffs' exemption argument.

Plaintiffs also claim that the Third Circuit, in *Singh v. Uber Technologies, Inc.*, 939 F.3d 210 (3d Cir. 2019), "found that the residual clause in § 1 of the FAA is not limited to transportation workers who transport cargo, and that the residual clause may operate to exclude from FAA coverage the contracts of employment of all classes of workers, so long as they are engaged in interstate commerce, or in work so closely related thereto as to be, in practical effect, a part of it." [ECF 50] at 3. However, what the Third Circuit in fact held was that section 1 may exempt those who transport passengers, and not merely cargo. *Singh*, 939 F.3d at 214, 226. With respect to the issue of whether workers are "engaged in interstate commerce," the *Singh* Court noted that "a court may only make that determination if the complaint and incorporated documents suffice." *Id*. at 226. Here, plaintiffs do not allege that they are "transportation workers" of any sort, but rather that TJS and Blue Water "hired plaintiffs to provide STEP[] construction services," and that plaintiffs "repaired hurricane-damaged roofs of homes in St. Thomas." Compl. [ECF 1-2] ¶¶ 32-33. These verified allegations are inconsistent with any notion that plaintiffs were transportation workers or engaged in even remotely similar activities. The FAA's section 1 does not exempt plaintiffs from arbitration.

Next, the Court considers plaintiffs' contention that they are not required to arbitrate their disputes because they had no written contract and received no consideration for such an agreement. [ECF 50] at 4-5. In a related argument, plaintiffs state they performed under an oral contract, and

*Cotto, et al. v.TJ Sutton Enters., LLC, et al.*
Civil No. 2021-16
Page 12

the defendants "knowingly failed to inform Plaintiffs" about the contracts between defendants. *Id*. at 6-7. Citadel and AECOM both take the position that these arguments are beside the point, as neither defendant has alleged the existence of any contract with an arbitration clause between plaintiffs and another party. Rather, defendants argue that there exist circumstances where non-signatories like plaintiffs may be required to arbitrate by virtue of agreements between others. [ECF 58] at 10-13; [ECF 59] at 6, 13-14. The Court agrees that the lack of a written contract between plaintiffs and defendants is of no moment. That is because plaintiffs' status as non-signatories to a contract does not preclude their being bound by the contract's arbitration provision.

Finally, plaintiffs briefly address the issue of binding non-signatories as third-party contract beneficiaries, concluding that plaintiffs are, "at most, indirect beneficiaries of Defendants' contracts . . . ." [ECF 50] at 7. Then, plaintiffs state that "[e]ven if the Court were to conclude that Plaintiffs, as Defendants claim, seek to 'exploit the benefits' of Defendants' contract, Defendants' conclusion that Plaintiffs must be bound is false." *Id*.

Citadel asserts, to the contrary, that the MSA and other contract documents "contain provisions that are intended to provide benefits to the class of persons that include the plaintiffs [ ] such as holding pay in trust for employees, the direct warranty of prompt payment to workers," along with other terms incorporated by reference in each of the agreements. [ECF 58] at 14 and n.8; *see also* [ECF 46] at 15-16. Citadel also points to direct benefits plaintiffs admit they received under the contracts, such as transportation, training, and housing. [ECF 58] at 14. In sum, Citadel claims that defendants can require plaintiffs to arbitrate under defendants' contracts.

AECOM likewise points to numerous provisions in various contracts that confer benefits on persons like plaintiffs, particularly the Staffing Agreement, which identifies six of the plaintiffs by name. [ECF 59] at 8-10. Further, AECOM notes that plaintiffs seek, for example, to benefit

*Cotto, et al. v. TJ Sutton Enters., LLC, et al.*
Civil No. 2021-16
Page 13

from the MSA by referring to the required performance and payment bonds to secure payment to them; AECOM argues that plaintiffs should not be permitted to disavow the arbitration provisions, while at the same time seeking to benefit from other portions of the contracts. [ECF 59] at 10-13.

The District Court of the Virgin Islands previously determined that the Virgin Islands would recognize the "knowingly exploits" theory of equitable estoppel in an arbitration setting. *See Sussman v. PCGNY Corp.,* 2020 WL 7706515, at *9 (D.V.I. 2020). In *Sussman*, the Court found that plaintiff, a non-signatory to a contract with a product supplier, was bound to arbitrate when it sought to take advantage of a warranty contained in that contract. *Id*. at *10. Further, it appears that the Virgin Islands recognizes the third-party beneficiary theory to enforce agreements to arbitrate. In *Lopez v Renaissance St. Croix Carambola Beach Resort & Spa*, 2019 WL 948416, at *4-5 (V.I. Super. Jan. 23, 2019), the court performed a *Banks* analysis and determined that the Virgin Islands would follow the Restatement (Second) of Contracts to permit a third-party beneficiary to enforce a contract to arbitrate. *See also Hendricks v. Pinnacle Servs., LLC*, 2020 WL 1358955, at *3-4 (V.I. Super. Mar. 16, 2020) (allowing an intended third-party beneficiary to invoke arbitration under an employment contract); *Williams v. Groundwater & Env. Servs., Inc.*, 2020 WL 814414, at *6 (V.I. Super. Jan. 8, 2020) (same). Thus, based upon the record, the Court finds that defendants have shown that plaintiffs, although not signatories to any of the contracts, are third-party beneficiaries of them, and may be compelled to arbitrate their disputes. Additionally, the Court finds that defendants have demonstrated that plaintiffs have accepted certain benefits under those contracts, and therefore cannot simply choose to ignore the arbitration provisions contained therein. Having previously found that the various contracts at issue are valid and enforceable, affect interstate commerce, and contain broad agreements to arbitrate disputes, the Court therefore concludes that an order compelling arbitration is appropriate.

*Cotto, et al. v.TJ Sutton Enters., LLC, et al.*
Civil No. 2021-16
Page 14

## IV. CONCLUSION

For the foregoing reasons, and the premises considered, it is ORDERED that:

(1) the motions to compel arbitration [ECFs 46, 47] are GRANTED;

(2) this matter shall be STAYED while arbitration proceeds; and

(3) the parties shall submit a joint report regarding the status of the arbitration every 90 days, starting on October 15, 2021.

**Dated:** July 19, 2021       S\ _____
                              **RUTH MILLER**
                              United States Magistrate Judge